**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CYNTHIA DILLON | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. WGC-04-994 |
| | ) | |
| THE MARYLAND-NATIONAL CAPITAL | ) | |
| PARK AND PLANNING COMMISSION | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

Pending before the Court and ready for resolution are Defendant The Maryland-National

Capital Park and Planning Commission ("MNCPPC")'s Renewed Motion for Judgment as a

Matter of Law (Document No. 58), Motion for a New Trial (Document No. 59), and Motion to

Alter or Amend the Judgment (Document No. 60).  Plaintiff Cynthia Dillon ("Ms. Dillon) filed

an Opposition (Document No. 62) and Defendant MNCPPC a Combined Memorandum in Reply

(Document No. 66).  No hearing is deemed necessary and the Court now rules pursuant to Local

Rule 105.6 (D. Md. 2004).

**BACKGROUND**

On March 25, 2004, Plaintiff filed a Complaint alleging that Defendant terminated her in

violation of the Family and Medical Leave Act ("FMLA").  In August 2002, Plaintiff requested

but was denied three weeks of leave between December 12, 2002 and January 2, 2003.  Her

supervisors however authorized her to take leave for one week between December 12 and

December 20, 2002.  Plaintiff was supposed to return to work December 23, 2002.  Plaintiff

alleges, upon arriving in Jamaica, her grandmother was in a worse medical condition than

1

Plaintiff had originally thought.  On December 19, 2002, Plaintiff sent an e-mail to her supervisor requesting additional time to make arrangements for her grandmother.  Plaintiff claims she never received a response from her supervisor.  Plaintiff alleges, when she returned to work on December 31, 2002, her employer, MNCPPC, charged her with Absence Without Leave ("AWOL") for more than three days from December 23 to December 31, 2002, and that she was officially terminated.  Plaintiff claims Defendant had advance notice of her need for leave to attend to her grandmother in Jamaica and that Defendant's denial of the FMLA leave request was pretextual and thus not in good faith.

On August 18, 2005, Judge Chasanow denied Plaintiff's Motion for Summary Judgment and denied in part and granted in part Defendant's Motion for Summary Judgment.  Judgment was entered in favor of Defendant and against Plaintiff as to Plaintiff's request for liquidated damages only.  *See* Document No. 25.

This case was tried before a jury between March 21 - 23, 2006.  On March 23, 2006, the jury returned a verdict in favor of Plaintiff.  The jury found that Plaintiff proved by a preponderance of the evidence that Defendant unlawfully interfered with the exercise of a protected right under the FMLA by denying Plaintiff's requested leave.  The jury further found that Defendant did not prove by the preponderance of the evidence that Plaintiff would have been terminated from her job not later than January 17, 2003 because she was insubordinate.  The jury awarded $76,914.00 to Plaintiff as lost wages as a result of Defendant's violation of the FMLA.  Finally, the jury found that Defendant did not prove by a preponderance of the evidence that Plaintiff failed to mitigate her damages.  The jury did not subtract any amount from the award of $76,914.00.  *See* Document No. 54 .  On March 31, 2006, the Court issued an Order of

Judgment, entering judgment in favor of Plaintiff and against Defendant in the amount of $76,914.00. The Court reserved the right to rule on any appropriate motions for prejudgment interest and an award of attorney's fees and costs. *See* Document No. 57.

## STANDARD OF REVIEW

A.     *Renewed Motion for Judgment as a Matter of Law*

Defendant moved for motion of judgment as a matter of law at the close of Plaintiff's case and at the close of all evidence before the case was submitted to the jury. These motions were denied. In accordance with Federal Rule of Civil Procedure 50(b), Defendant has renewed its motion post-trial. Defendant filed its post-trial motions three days after the Court issued the Order of Judgment in favor of Plaintiff, well within 10 days after entry of judgment. Fed. R. Civ. P. 50(b). Defendant has complied with all procedural requirements.

A court should not "disturb a jury verdict 'unless, without weighing the evidence or assessing witness credibility, [the court] conclude[s] that reasonable people could have returned a verdict' only for the moving party." *Randall v. Prince George's County, Md.*, 302 F.3d 188, 201 (4th Cir. 2002) (quoting *Cooper v. Dyke*, 814 F.2d 941, 944 (4th Cir. 1987)). "If a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture, judgment as a matter of law must be entered." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005) (citing *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 160 (4th Cir. 1988)). However, "[i]f the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied." *Id.* at 489-90 (citing *Hofherr v. Dart Indus. Inc.*, 853 F.2d 259, 261-62 (4th Cir. 1988)). The Court must review the

evidence and all reasonable inferences in the light most favorable to Plaintiff, the prevailing

party at trial and the non-moving party in this dispute.  In accordance with Federal Rule of Civil

Procedure 50(b), since a verdict was returned, the Court may allow the judgment to stand, order

a new trial, or direct entry of judgment as a matter of law in favor of Defendant.

B.      *Motion for New Trial*

Defendant timely moved for a new trial in accordance with Federal Rule of Civil

Procedure 59(b).  The Court has discretion to grant such a motion if the Court opines that "[1]

the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is

false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence

which would prevent the direction of a verdict."  *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l*

*Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996) (quoting *Aetna Casualty & Sur. Co. v. Yeatts*,

122 F.2d 350, 352-53 (4th Cir. 1941)).  The decision to grant or deny a motion for a new trial

rests within the sound discretion of this Court.  *Bristol Steel & Iron Works, Inc. v. Bethlehem*

*Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994).

C.      *Motion to Alter or Amend Judgment*

Defendant timely moved to alter or amend judgment in accordance with Federal Rule of

Civil Procedure 59(e).  "A district court has the discretion to grant a Rule 59(e) motion only in

very narrow circumstances:  '(1) to accommodate an intervening change in controlling law; (2)

to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent

manifest injustice.'"  *Hill v. Braxton*, 277 F.3d 701, 708 (4th Cir. 2002) (quoting *Collison v.*

*International Chemical Workers Union*, 34 F.3d 233, 236 (4th Cir. 1994)).

## DISCUSSION

A.    *Renewed Motion for Judgment as a Matter of Law*

Defendant renews its motion for judgment as a matter of law, contending the evidence

presented during trial fell short as a matter of law that Plaintiff was entitled to FMLA leave, for

the following reasons:

> (1) Ms. Dillon did not provide adequate notice under the statute; (2)
> Ms. Dillon did not prove her grandmother was her "parent" within
> the meaning of the act; (3) Ms. Dillon did not prove her leave request
> was "in order" to care for a "serious health condition[;]" (4) Ms.
> Dillon failed to provide sufficient proof that her grandmother suffered
> from a "serious health condition" within the meaning of the FMLA;
> (5) Ms. Dillon's FMLA rights were not unlawfully interfered with,
> but instead her employment was terminated for reasons discrete from
> the FMLA issue and Ms. Dillon failed to prove she would have
> otherwise remained employed so as to have sustained damages by
> reason of the so called violation; and (6) Ms. Dillon failed to prove
> the damages awarded with reasonable certainty.

Def.'s Combined Mem., at 5.

The Court addresses each alleged unproven qualification for FMLA leave below.

1.    *Providing Adequate Notice Per the Statute*

Defendant claims, when Ms. Dillon arrived in Jamaica on December 12, 2002 and visited

her grandmother, Ms. Dillon learned her grandmother had suffered a "small stroke." Ms. Dillon

however did not contact her employer seeking an extension of time to care for her grandmother

until December 19, 2002, a full week after learning of her grandmother's condition and one

workday before Ms. Dillon's scheduled return to work. Defendant notes Ms. Dillon sent an e-

mail on December 19, 2002 (after work hours), did not initiate any contact the following day,

and waited until December 23, 2002 (the day she was scheduled to report to work) to call her

office. Defendant claims Ms. Dillon's notice does not comply with timing requirements outlined

5

in the FMLA regulation.

In her Opposition Plaintiff argues the jury could reasonably find Ms. Dillon's request met the standard for the timing and substance of the required notice.  "The record shows that this notification was provided as soon [as] plaintiff recognized that she would need leave beyond the date of her scheduled return to work date on December 23.  Therefore, she easily fit[s] within the notification requirements of the regulations."  Pl.'s Opp'n, at 13.

In its Reply Defendant reasserts Ms. Dillon's notice was untimely.  "[I]t is uncontested she knew of the alleged qualifying condition the day she arrived and the record evidence does not support a jury finding in her favor on this issue."  Def.'s Reply, at 4 (footnote omitted).

29 C.F.R. § 825.302(a) states, in pertinent part:

> An employee must provide the employer at least 30 days advance notice before FMLA leave is to begin if the need for the leave is foreseeable based on an expected birth, placement for adoption or foster care, or planned medical treatment for a serious health condition of the employee or of a family member.  If such 30 days notice is not practicable, such as because of a lack of knowledge of approximately when leave will be required to begin, a change in circumstances, or a medical emergency, notice must be given as soon as practicable.

Neither side contends that Ms. Dillon's notice was untimely because it was not given 30 days in advance.  Both agree, based on the facts of this case, the issue of Ms. Dillon's timeliness must be assessed based on the less than 30 days standard.

It is undisputed Ms. Dillon requested an extension of leave via e-mail on December 19, 2002.  Below are pertinent portions of e-mail exchanges between Patricia Barney ("Ms. Barney"), MNCPPC's Secretary-Treasurer and Ms. Dillon's fifth level supervisor, and Ms. Dillon on December 23, 2002 and December 28, 2002 respectively.

> I am also concerned that you waited until the Thursday before the Monday you were due back and e-mailed me after 6:30 p.m. our time to notify me that you wanted an extension of time.  You also did not read my response back to you Friday morning or try to contact me on Friday.

Pl.'s Ex. 8 (Ms. Barney's e-mail); Def.'s Ex. 1T (Ms. Barney's e-mail).

> Patti, my leave did not expired [sic] before I emailed you.  I emailed you immediately as I realized that I was not getting through before my time.  And yes, I grew up with my grandmother.

> I have been taking care of her ever since I got here, my vacation turned out to be sick time with her.  I have make [sic] final arrangements for her and can be back in the office January 2, 2003.

Pl.'s Ex. 8 (Ms. Dillon's e-mail); Def.'s Ex. 1S (Ms. Dillon's e-mail).

At trial Ms. Dillon testified, upon finding her 81 year old grandmother in a very, very poor condition, she spent all of her free time taking care of and assisting her grandmother.  *See* Tr. at 95:24 - 96:5 (March 21, 2006).  Ms. Dillon explained why she did not contact her employer before December 19, 2002.

> I – – I was so caught up in trying to help my grandmother that the dates wasn't [sic] even – – I didn't realize the dates were getting close.  So as soon as I realize the date, I went into town and informed my – – you know, get a[n] email service and inform my employers what was going on.

Tr. at 96:8 - 12 (March 21, 2006).

She repeated this response when questioned directly.

> Q:  Was there any reason you waited until December 19th to inform your management about your request?

> A:   No, absolutely not.  I did not have a specific reason why I waited.  Like I said, I was totally caught up in taking care of my grandmother, and actually, by the time I realize, it was the 19th already, and then I said, oh, I have to go into town.

Tr. at 117:12 - 18 (March 21, 2006).

Ms. Dillon testified that her grandmother lived in a home without running water or an indoor toilet.  Because of her grandmother's frail condition, Ms. Dillon asked her mother-in-law if she (Ms. Dillon) could bring her grandmother to the house, because her mother-in-law's home had running water and an indoor toilet.  Ms. Dillon's grandmother stayed with Ms. Dillon, at her mother-in-law's home, until a few days before Ms. Dillon departed Jamaica.  Neither party disputes Ms. Dillon sought additional time, beyond her approved leave, to take care of her 81 year old grandmother.

The Court instructed the jury regarding the timing and adequacy of notice per Jury Instruction Nos. 25 and 26.

> JURY INSTRUCTION NO. 25[1]
>
> When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case.  It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible.
>
> The phrase "appropriate notice" as used in these instructions means that the plaintiff must have notified defendant of her need for leave as soon as practicable after she learned of the need to take leave.
>
> JURY INSTRUCTION NO. 26[2]
>
> The employee need not expressly assert rights under the FMLA or

---

[1] Sources: 1st paragraph: 29 C.F.R. § 825.303(a) [first two sentences]; 2d paragraph: Sand, et al., *Modern Federal Jury Instructions*, Instruction 88-135.

[2] Sources: 1st sentence -  29 C.F.R. § 825.302(c) [2d sentence - slightly modified]; 2d sentence - 29 C.F.R. § 825.303(b) [last sentence].

even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means. The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.

It is undisputed Ms. Dillon notified her employer by e-mail on December 19, 2002 of her need for leave, beyond her approved annual leave, to take care of her grandmother.  It is further undisputed Ms. Dillon had to return to work on December 23, 2002.  Based on her testimony that she was "caught up" caring for her grandmother and did not realize her approved leave was rapidly approaching an end until December 19th, prompting Ms. Dillon to send an e-mail to her employer requesting additional time to find suitable living quarters for her grandmother, a jury could reasonably conclude Ms. Dillon's need for leave did not arise until December 19th and that she notified her employer within one workday of the date scheduled to return to work in accordance with the FMLA regulation.  In her e-mail Ms. Dillon did not expressly invoke FMLA, and was she required to mention FMLA.  Defendant fails to demonstrate its entitlement to judgment as a matter of law on this issue.

2.      *Proof that Grandmother Qualifies as a "Parent" Under FMLA*

Defendant claims, as of January 17, 2003 when it terminated Plaintiff's employment, Plaintiff failed to provide sufficient information that her grandmother qualified as a parent within the meaning of the FMLA, and therefore, Defendant is entitled to judgment as a matter of law. Defendant denies Ms. Dillon told her supervisors that her grandmother raised her before the December 23, 2002 e-mail.  When challenged by Ms. Barney, Defendant contends Ms. Dillon "retreated" and stated she grew up with her grandmother.  In her FMLA package, Ms. Dillon further "retreated" by describing her grandmother as always instrumental in her life.  Ms. Dillon

described her grandmother feeding her, combing her hair, taking her to church and playing a major role in her upbringing.  When Ms. Barney gave Ms. Dillon one last opportunity to define the nature of the relationship with her grandmother, Ms. Dillon added that in her community "everyone helped everyone."  Defendant argues the information Ms. Dillon provided before her termination falls short of the legal relationship, *in loco parentis*, contemplated by the FMLA regulation.

In her Opposition Plaintiff relies on Judge Chasanow's memorandum opinion in which Judge Chasanow denied in part Defendant's motion for summary judgment.  In that opinion Judge Chasanow wrote, "[the pre-termination] evidence is enough to create a triable issue as to whether [Ms. Dillon] was entitled to FMLA leave in order to care for her grandmother."  *Dillon v. Maryland-Nat'l Capital Park & Planning Comm.*, 382 F. Supp. 2d 777, 786 (D. Md. 2005). Plaintiff argues, based on the definition of *in loco parentis*, she has presented sufficient evidence which could lead a reasonable jury to conclude a parent-child relationship existed between the grandmother and Ms. Dillon.

In its Reply Defendant contends Plaintiff improperly relies on post-termination evidence to demonstrate *in loco parentis*.  Defendant argues the admission of post-termination evidence was prejudicial.  If only pre-termination evidence had been presented, Defendant claims a reasonable jury could only conclude that the relationship between Ms. Dillon and her grandmother did not satisfy the requirements of the FMLA, and thus, Defendant is entitled to judgment as a matter of law.

At trial Ms. Dillon testified that her mother was 16 years old when she gave birth to Ms. Dillon.  When asked to explain the living arrangements at the time of her birth, Ms. Dillon

answered:

> A:   My grandmother actually raised me because my mother was young and, of course, inexperienced, and my grandmother took me almost instantly as her own because I was the first grandchild for her. And she raised me, fed me, take me to church and everything. Financially supports me.  The whole works, as a mother would.
>
> Q:   And I see from your letter you indicated that you actually even slept with her?
>
> A:   Yes.  In the same bed with her.

Tr. at 103:18 - 104:1 (March 21, 2006).

The information Ms. Dillon provided before her termination did not specifically mention that her mother was a teenager when she gave birth to Ms. Dillon, that Ms. Dillon's grandmother financially supported Ms. Dillon or that Ms. Dillon's grandmother basically performed all motherly functions by doing "everything."  MNCPPC does not dispute Ms. Dillon's claim that her grandmother raised her, though MNCPPC characterizes as a "retreat" Ms. Dillon's change in terminology *from* her grandmother raised her *to* she grew up with her grandmother.  What is not disputed and is overall consistent with her trial testimony is a paragraph from Ms. Dillon's January 4, 2003 letter supporting her application for FMLA leave.

> I am the first grandchild for Ms. Lowe.  During my childhood my grandmother was always instrumental in my life.  My mother was around but I was always with my grandmother.  I slept with her, always in a fight with my aunt to sleep directly [with] my grandmother as she always slept at the edge of the bed.  My grandmother fed me, take me to church on Saturdays, and comb my hair[.]   [A]s I stated she played a major role in my upbringing.

Pl.'s Ex. 10, at 1; Def.'s Ex. 7, at 1.

At the conclusion of trial, the jury was instructed not to consider evidence which was not provided to MNCPPC before January 17, 2003 in determining whether the MNCPPC interfered

11

with any FMLA rights Plaintiff may have had.  *See* Jury Instruction No. 34.  The Court defined

*parent* meaning a biological parent or an individual who stand or stood *in loco parentis*.  *See*

Jury Instruction No. 19.  With Jury Instruction No. 20[3], the Court defined *in loco parentis*.

> Persons who are *in loco parentis* include those with day-to-day
> responsibilities to care for and financially support a child or, in the
> case of an employee, who had such responsibility for the employee
> when the employee was a child.  A biological or legal relationship is
> not necessary.
>
> The term *in loco parentis* according to its generally accepted
> common law meaning, refers to a person who has put himself in the
> situation of a lawful parent by assuming obligations incident to the
> parental relation without going through the formalities necessary to
> legal adoption.  It embodies the two ideas of assuming parental status
> and discharging parental duties.  The phrase *in loco parentis* is
> defined as in the place of the parent, charged with the parent[']s
> rights, duties and responsibilities.  The mere fact of being a
> grandparent does not necessarily give rise to *in loco parentis* status.
> The key in determining whether the relationship of *in loco parentis*
> is established is found in the intention of the person allegedly *in loco
> parentis* to assume the status of a parent toward a child.
>
> The intent to assume such parental status can be inferred from the
> acts of the parties.  Other factors which are considered in determining
> whether *in loco parentis* status has been assumed are (1) the age of
> the child; (2) the degree to which the child is dependent on the person
> claiming to be standing *in loco parentis*; (3) the amount of support,
> if any provided; and (4) the extent to which duties commonly
> associated with parenthood are exercised.

Excluding the post-termination information presented at trial and relying solely on the

pre-termination information, there is sufficient evidence for a reasonable jury to conclude Ms.

Dillon's grandmother assumed *in loco parentis* status.  In addition to stating that her

grandmother raised her, Ms. Dillon's January 4, 2003 letter reveals that her grandmother, in

---

[3] Sources: 1st paragraph - 29 C.F.R. § 825.113(c)(3); 2d - 3d paragraphs - *Dillon v. Maryland-National Capital Park & Planning Comm.*, 382 F. Supp. 2d 777, 786-87 (D. Md. 2005).

essence, had day-to-day responsibilities.  Ms. Dillon notes her mother was around, but she

discloses she was always with her grandmother.  Ms. Dillon describes her grandmother as being

instrumental in her life and playing a major role in her upbringing.  A reasonable jury could infer

that Ms. Dillon was very dependent as a child upon her grandmother. A reasonable jury could

also infer that the grandmother stood *in loco parentis* to her granddaughter.  Contrary to

Defendant's assertion, the evidence does not suggest only one conclusion — Ms. Dillon's

grandmother was *not* a qualified parent within the meaning of the FMLA.  Defendant fails to

demonstrate its entitlement to judgment as a matter of law on this issue.[4]

> 3.      *Proof that Grandmother Suffered a "Serious Health Condition*

Defendant next argues that it is entitled to judgment as a matter of law because Plaintiff

failed to prove her grandmother had a serious health condition.  Defendant summarizes Dr.

Nesbeth's testimony about the condition of Ms. Lowe, Plaintiff's grandmother, as follows:

> ([1]) it was not serious enough for her to be hospitalized; (2) Ms.
> Lowe suffered a TIA, or a "small stroke" [;] (3) Ms. Lowe was given
> a medical injection to bring her blood pressure down and left the
> hospital the same day she was brought in; (4) an aide was sent to Ms.
> Lowe the next two days to check her blood pressure which was
> within normal levels; (5) the doctor told Ms. Lowe to take aspirin
> every day; (6) Ms. Lowe did not have high blood pressure; (7) Dr.
> Nesbeth's testimony focused not on the seriousness of the then-
> existing condition, but rather that the condition might be a signal of
> a serious condition to come down the road; and (8) Ms. Lowe did not
> return to see the doctor until 19 days later, on December 28th for a

---

[4] As discussed in the March 3, 2006 Memorandum Opinion (Document No. 44), the Court permitted post-termination information about Ms. Dillon's grandmother.  This decision was based on the Court's review of FMLA cases where post-termination medical evidence was deemed admissible.  "If post-termination medical evidence is relevant to whether an employee had a serious health condition at the time of his termination, *see Frazier* [*v. IBP, Inc.* No. C97-0023, 1999 WL 33655745 (N.D. Iowa Feb. 2, 1999)], by analogy, post-termination evidence is relevant to whether Ms. Dillon was qualified to take FMLA leave to care for her grandmother at the time the Commission fired Ms. Dillon." Document No. 44, at 7.  Ms. Dillon was not seeking to present *new* information, such as her grandmother was actually her mother and thus a qualified family member under FMLA.  Such information would not be admissible because Ms. Dillon did not provide *notice* to her employer before termination.

check-up.

Def's Combined Mem., at 19.

Based on Dr. Nesbeth's testimony, Ms. Lowe's "small stroke" does not qualify as a "serious health condition" as defined by the Court in Jury Instruction No. 23.  First, Plaintiff did not demonstrate Ms. Lowe was incapacitated for more than three consecutive days.  Second, Plaintiff did not demonstrate Ms. Lowe was under the continuing treatment of a physician.  According to Defendant, the aide dispatched by Dr. Nesbeth to check Ms. Lowe's blood pressure on two consecutive days does not constitute "continuing treatment of a physician."  Moreover, Dr. Nesbeth's instruction that Ms. Lowe take an aspirin daily, vice prescription medication, is insufficient to constitute continuing treatment by a physician.  Finally, Dr. Nesbeth determined Ms. Lowe experienced a TIA[5] or a small stroke.  The FMLA regulation lists examples of serious health conditions.  A "severe stroke" qualifies as a serious health condition.  A small stroke suffered by Ms. Lowe does not.  *See* Def.'s Combined Mem., at 22.  Defendant asks for judgment as a matter of law on this issue.

In her Opposition Plaintiff argues a reasonable jury could find that Ms. Lowe had a serious health condition.  First, on the *Certification of Health Care Provider* ("*Certification*"), Dr. Nesbeth opined Ms. Lowe would be incapacitated two to three weeks due to the TIA on December 9, 2002.  This assessment satisfies the more than three consecutive calendar days of incapacity as required by the FMLA regulation.  Second, at trial, Dr. Nesbeth explained, that due to Ms. Lowe's age (81 years old), a TIA was far more serious than for someone much younger.  "Indeed the two to three week period after the stroke was critical because if she had another

---

[5] Transient Ischemic Attack.

stroke during that period it would possibly be fatal — thus, the reason why she was incapacitated for that length of time."  Pl.'s Opp'n, at 18 (footnote omitted).  Third, Ms. Lowe's condition required substantially more than the amount of medical care to qualify as a "serious health condition" per the regulation.  "In regard to this issue the evidence reflected that her grandmother required at least two visits to the doctor and at least two or three more visits from the doctor's assistants for monitoring and/or therapy.  Thus, the grandmother's condition easily fit[s] with the regulation's definition of 'serious health condition' in this case."  *Id.* at 19 (footnote omitted).

In its Reply Defendant claims Plaintiff has embellished Dr. Nesbeth's testimony and the contents of the *Certification*.

> Nowhere did Dr. Nesbeth ever indicate Ms. Lowe would be incapacitated, let alone for 2-3 weeks as asserted.  Dr. Nesbeth testified that if Ms. Lowe sustained another stroke <u>then</u> it could be more serious.  Dr. Nesbeth's testimony focused not on any severity of Ms. Lowe's then current condition, but later on the prospect that a stroke could come down the road.  This testimony does not demonstrate an existing serious health condition.  The 2-3 weeks referenced in the Medical Certification Form referred to the time needed by Ms. Dillon, not Ms. Lowe.

Def.'s Reply, at 7-8 (footnote omitted).

Defendant asserts Plaintiff has not demonstrated either incapacity or continuing treatment.  Plaintiff did not present any evidence at trial that Ms. Lowe could not perform her regular daily activities after suffering the TIA.  Evidence of continuing treatment is lacking.  The assistant dispatched by Dr. Nesbeth to assess Ms. Lowe's blood pressure, who Defendant equates to an aide or tech, is not a nurse or Physician's Assistant as contemplated by the regulation and these visits by Dr. Nesbeth's "aide" do not meet the regulation's requirements of continuing treatment.

15

As a matter of law Plaintiff has not proven her grandmother had a serious health condition.

At trial Dr. Nesbeth testified that she saw Ms. Lowe on December 9, 2002. Ms. Lowe complained of dizziness. She was trembling. The attendant with Ms. Lowe reported Ms. Lowe had blacked out, meaning when people spoke with Ms. Lowe, she did not respond and only stared back at them. Upon examination Dr. Nesbeth found Ms. Lowe dizzy and trembling. Dr. Nesbeth noted Ms. Lowe's blood pressure was very high. When asked questions, Ms. Lowe's response time was slow and she seemed a little confused. Dr. Nesbeth diagnosed TIA. She administered an injection for Ms. Lowe's high blood pressure and she sent Ms. Lowe home on coated aspirin, standard treatment to prevent a stroke. Tr. at 45:5 - 46:5 (March 21, 2006).

Next, Dr. Nesbeth described the continuing or follow-up treatment:

Q:   And did you continue to observe and treat Ms. Lowe?

A:   Yes. Usual treatment is to observe because you do not want a patient to get a stroke, a cerebral accident attack, so I sent a trainee from the office the following day – – because of her condition, I didn't want her to come out, so since it wasn't serious in the sense where she had to be hospitalized, she just had to be monitored by home care and home attendants, I sent an assistant from the office to do her blood pressure. It was normal. It was 120 over 80. And she – – the assistant was sent back the following day to make sure.

The reason for this is because one high blood pressure reading doesn't make you a hypertensive or a high blood pressure patient. You need three consecutive readings of high readings. So the other two were normal, so I recognized that the high blood pressure reading was because she had the TIA.

She was contained on conservative management. The most important thing was just to monitor her care and to see that she got her medication and her daily needs were attended to.

Q:   Okay. Did you continue to monitor – –

A:   We did. I saw her on the 28th of December.

16

> Q:   Okay.  28th of December, that's roughly two and a half weeks later?
>
> A:   Nine from 28, that's what – – 17, 18, 19, 19 days, yes.
>
> Q:   Nineteen days later.  And how did you find her at that time?
>
> A:   She was much better.  Still a little slow, but the pressure was normal.  She was more responsive but was a little lethargic mentally, slow and still trembling.
>
> Q:   Okay.  And at some point in January of 2003, roughly a week later after you treated her on December 28th, did you have an occasion to treat her again or see her again?
>
> A:   I saw her on the 8th of the first – – 8th of January, 2003.
>
> Q:   And what did you find her condition to be at that time?
>
> A:   She was much improved.  She only had a little bladder infection.

Tr. at 46:14 - 48:2 (March 21, 2006).

Dr. Nesbeth explained why it was important to closely monitor Ms. Lowe after she

suffered a TIA on December 9th.

> A:   [A] TIA, transient ischemic attack, is the initial warning, so to speak, of a stroke.  A cerebral vascular accident it is medically called, but commonly known as a stroke.
>
> You monitor it to make sure that there's no repeat because chances are if she gets another TIA, then the next one she gets will be fatal, so you usually monitor and follow up the patient during the sensitive period.  And that was why it was important that someone was there to make sure that she was okay, she wasn't confused, she didn't fall again or stumble or anything like that.

Tr. at 55: 10 - 20 (March 21, 2006).

On cross-examination Dr. Nesbeth was questioned about the *Certification*.

> Q:   Now, under 5B, will it be necessary for the employee to take work only intermittently or to work a less than full schedule as a

17

result of the condition, including for treatment described in Item 6 below?  You put?

A:  Yes.

Q:  You indicated, yes.

    If yes, give the probable duration.  Can you read what you wrote there?

A:  I wrote two to three weeks her granddaughter will need to look after her and find a caregiver to monitor her needs since she's 81.

Q:  When you're saying she – – since she's 81, are you referring to Ms. Lowe?

A:  Elvira Lowe.

Q: Who's 81 years old?

A:  Who is [81] years old.

Q:  Okay.  Then under 6A, if additional treatments will be required for the condition, provide an estimate of the probable number of such treatments.

    You put an entry in?

A:  I put forever.  Monthly for life.

Q:  Turning to the next page of the Family Leave Act form, which is Bates stamped 0005, I notice that the first entry you give is under 8A?

A:  Correct.

Q:  If leave is required to care for a family member of an employee with a serious health condition, does the patient require assistance for basic medical, personal needs or safety or for transportation?  What did you insert?

A:  I wrote yes.

Q:  Then under C, you have an entry, if the patient will need care

18

only intermittently or on a part-time basis, please indicate the probable duration of this need.

A: Two to three weeks.

Tr. at 59:22 - 61:5 (March 21, 2006).

Dr. Nesbeth was questioned about the significance, if any, of Ms. Lowe's age.

Q: Now, you had indicated that Ms. Lowe needed care because she was 81. Was that because she was 81 or because she was 81 and had the TIA?

A: Eighty-one and had a TIA. She – – she was 81 before the TIA, so it had no relevance.

Q: In your opinion, would she have needed care with or without the TIA?

A: No, not the quality care she would have needed with the TIA, because, remember, she was trembling and confused with the TIA.

Tr. at 63:19 - 64:3 (March 21, 2006).

The Court defined "serious health condition" in Jury Instruction No. 23[6] as follows:

A "serious health condition" means an illness, injury, impairment or physical or mental condition that involves either 1) inpatient care in a hospital, hospice, or residential medical care facility, or 2) continuing treatment by a health care provider.

A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(a) A period of incapacity (that is, an inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

---

[6] Sources: 1st paragraph - Sand, et al., *Modern Federal Jury Instructions*, Instruction 88-131; 2d - 4th paragraphs - 29 C.F.R. § 825.114(a)(2) - (a)(20(i)(B); 5th - 8th paragraphs - 29 C.F.R. § 825.114(a)(2)(iii) - (a)(2)(iii)(C).

(1) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (for example, a physical therapist) under orders of, or on referral by, a health care provider; or

(2) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

(b) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

(1) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(3) May cause episodic rather than a continuing period of incapacity (for example, asthma, diabetes, epilepsy, etc.).

Based on Dr. Nesbeth's testimony and the above instruction, the Court finds a reasonable jury could find Plaintiff's grandmother, Ms. Lowe, had a serious health condition. Jurors could reasonably infer from Dr. Nesbeth's testimony that Ms. Lowe's age of 81 years coupled with suffering the TIA qualifies as a serious health condition. It is undisputed that Dr. Nesbeth saw Ms. Lowe on December 9th and that an assistant of Dr. Nesbeth visited Ms. Lowe on December 10th and 11th to check Ms. Lowe's blood pressure. These three visits would meet the period of incapacity standard regarding "treatment two or more times by a health a health care provider." The parties quibble about whether this assistant is an aide or tech. In its Reply Defendant

20

asserts, "Plaintiff . . . glosses over a critical distinction and relegates its treatment to a footnote; this time the distinction between a nurse or Physician's Assistant and the tech who took Ms. Lowe's blood pressure reading on two occasions.  Plaintiff ignores the obvious and wide chasm between the credentials and treatment authority of a Physician's Assistant as opposed to an aide or tech."  Def.'s Reply, at 9.  Neither party questioned Dr. Nesbeth about the assistant's medical or nursing credentials.  Defendant could have demonstrated Dr. Nesbeth's assistant was not qualified during cross-examination, but did not.  The parties' arguments that this assistant either does or does not qualify is pure speculation.  It is undisputed that this assistant was "under the direct supervision of" Dr. Nesbeth, a health care provider, since Dr. Nesbeth instructed the assistant to visit Ms. Lowe and measure her blood pressure.  The jurors could reasonably infer this assistant was a "Physician's Assistant" as mentioned in Jury Instruction No. 23.

Defendant argues Plaintiff did not demonstrate that Ms. Lowe was incapacitated.  During trial Dr. Nesbeth was questioned extensively about the *Certification*.  When Dr. Nesbeth filled out the *Certification*, she unequivocally stated that Ms. Lowe required assistance for basic medical, personal needs or safety or for transportation.  *See* Tr. at 60:22 - 61:1 (March 21, 2006). Dr. Nesbeth's affirmative response is easily readable on the form.  This *Certification* was submitted to the MNCPPC *before* January 17, 2003.  Based on Dr. Nesbeth's medial assessment of Ms. Lowe, a patient Dr. Nesbeth has been treating since 1997, *see* Tr. at 45:25 - 46:1 (March 21, 2006), a reasonable jury could conclude Ms. Lowe was incapacitated for a period of time after suffering the TIA.  Defendant fails to demonstrate its entitlement to judgment as a matter of law on this issue.

4.       *Leave Request "In Order to Care for" a "Serious Health Condition"*

Even if the Court finds Plaintiff's grandmother had a serious health condition, Defendant argues Plaintiff fails to demonstrate that her request for extended leave, beyond her approved annual leave of December 12th - 20th, was made in order to care for her grandmother. Defendant concedes Plaintiff did not learn of her grandmother's illness until her arrival in Jamaica December 12, 2002.  It is uncontested Ms. Lowe suffered the stroke three days before on December 9th.  Defendant claims Ms. Lowe has two daughters who shared responsibilities as caretakers.  Ms. Carmelita Lowe always took her mother to medical appointments.  Ms. Berthlyn Ellis lived with her mother.  "During her time in Jamaica, Ms. Dillon never accompanied her grandmother to a doctor's appointment while Ms. Lowe's daughters took her to one appointment with Dr. Nesbeth and another with a different clinical Doctor."  Def.'s Combined Mem., at 27. Defendant asserts Plaintiff's request for leave, at most, was to obtain better living accommodations for her grandmother.  Though laudable, this is not sufficient under the FMLA regulation.  Plaintiff presented no evidence of attempting to secure an assisted living facility per the regulation.  "Ms. Dillon returned to Maryland on the date <u>she</u> originally planned and did so without securing either an assisted living arrangement or a new house (which her aunt had allegedly identified) for her grandmother and aunt."  *Id.* at 28.  Defendant asserts Plaintiff presented false information to MNCPPC to justify her leave request.  *See id.* at 24 n.7.  The evidence clearly shows Plaintiff failed, as a matter of law, to demonstrate the request for leave was "in order to care for" her grandmother.

In her Opposition Plaintiff characterizes the FMLA regulation as very liberal and expansive in defining situations in which an employee is needed to care for a family member

with a serious health condition.  She asserts she was needed to care for her grandmother for reasons consistent with the regulation.  First, she needed to find better living accommodations for her grandmother post-stroke.  "Specifically, plaintiff needed to find a place with *inter alia* indoor plumbing so that it was safe for her grandmother to use the bathroom and to walk about. A reasonable jury could find that plaintiff was taking care of her grandmother's hyg[i]enic and safety needs which the grandmother was unable to do on her own."  Pl.'s Opp'n, at 20.  Second, a reasonable jury could find, since the grandmother was incapacitated, Plaintiff needed to provide physical, psychological, medical and hygienic care.  Third, even though the grandmother had another caretaker, a reasonable jury could find Plaintiff needed to fill in for others in taking care of her grandmother or to make arrangements for changes in her grandmother's care. Regarding Defendant's insinuation that Plaintiff lied about her grandmother's need for care, "such credibility decisions were the province of the jury and defendant's desire that the jury come out the other way is not sufficient for overturning the verdict."  *Id.* at 21 (footnote omitted).

In its Reply Defendant asserts Plaintiff failed to meaningfully address Defendant's argument that Plaintiff lacked evidence supporting her need to care for her grandmother.  No evidence supports the claim of safety and hygienic needs.  "Plaintiff now admits her grandmother had another caretaker, but again asserts (without the benefit of record evidence) that she was needed to fill in for the caretaker.  However, this is at odds with both her communications with the workplace in the relevant time period and her Medical Certification Form."  Def.'s Reply, at 10.  Defendant reiterates that Plaintiff was deceptive which MNCPPC about the caregiver's status, information that Plaintiff supplied to Dr. Nesbeth and submitted in

support of her FMLA application.  For all these reasons Plaintiff has failed to prove her leave

request was in order to care for her grandmother.  Defendant is entitled to judgment as a matter

of law.

The Court first addresses the issue of Ms. Dillon's alleged deception.  "The reason

provided to her employer in her FMLA application was finding a "B. Ellis" to care for her

grandmother.  Not only was that statement false and misleading, it is patently inconsistent with a

suggestion that the reason for the leave was to provide relief for Ms. Ellis so that she could go to

work."  Def.'s Combined Mem., at 24 n. 7.  Plaintiff rejects such allegations.  This issue,

whether Ms. Dillon was or was not deceptive, is an issue of fact and of credibility.  Before

deliberations the jury was instructed, "you and only you are the judges of the facts," Jury

Instruction No. 1, and "[y]ou are the sole judges of whether testimony should be believed[,]"

Jury Instruction No. 10.  During the trial Defendant's counsel elicited testimony from Dr.

Nesbeth regarding "B. Ellis."

> Q:  That last phrase, "And found B. Ellis to look after her," meaning Ms. Lowe?
>
> A:  Granddaughter came and looked after her.
>
> Q:  Um hum.
>
> A:  Looked after her and found B. Ellis to look after her.
>
> Q:  Now, you don't know who B. Ellis is?
>
> A:  No.  B. Ellis is Berthlyn Ellis.  I knew her on the 8th of January when she brought back Ms. Elvira Lowe.
>
> Q:  Would it surprise you to know that Berthlyn Ellis is Ms. Lowe's daughter who lived with her both before and after this incident?
>
> A:  I wouldn't know.

24

Tr. at 66:25 - 67:11 (March 21, 2006).

In its Reply Defendant asserts, "Dr. Nesbeth testified she got the information [about "B. Ellis"] from Ms. Dillon."  Def.'s Reply, at 11.  Dr. Nesbeth did not affirmatively testify as such but a reasonable jury could infer Dr. Nesbeth obtained the information from Ms. Dillon. Defendant's counsel had an opportunity to cross-examine Plaintiff about this alleged deception but for reasons unknown did not.  In closing argument, Defendant's counsel suggested Ms. Dillon's "sandbagged" Dr. Nesbeth.  *See* Tr. at 163:24 - 164:6 (March 22, 2006).  That is the only allusion to this deception regarding "B. Ellis."  Based on this record, a reasonable jury could find that Ms. Dillon was *not* false and misleading with MNCPPC regarding the need to relieve "B. Ellis" so she could work.  Such a factual finding is within the sole province of the jury.

The Court now turns to whether Plaintiff demonstrated she needed leave in order to care for her grandmother.  Before deliberations the jury was instructed as follows:

> An employee is "needed to care for" a spouse, son, daughter or parent with a serious health condition when the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety; or is unable to transport himself or herself to the doctor. The phrase also includes providing psychological comfort and reassurance which would be beneficial to a family member with a serious health condition who is receiving inpatient or home care.  The phrase also includes situations where the employee may be needed to fill in for others who are caring for the family member, or to make arrangements for changes in care, such as transfer to a nursing home.

Jury Instruction No. 22.[7]

Assuming the jury followed Jury Instruction No. 34 and considered only evidence

---

[7] Source: Sand, et al., *Modern Federal Jury Instruction*, Instruction 88-130.

provided to MNCPPC as of January 17, 2003, a reasonable jury could find Ms. Dillon presented

evidence demonstrating her need for leave to care for her grandmother.  On December 19, 2002,

Ms. Dillon sent to Ms. Barney an e-mail from Jamaica, which states in pertinent part:

> I am requesting an extension of sick leave because my grandma is
> very ill and I am in the process of finding a home for her.  The time
> is very limited and the process is very slow.  I will greatly appreciate
> this extension.  Please let me know by email.  Thank you.

Pl.'s Ex. 7 (CD00044); Def.'s Ex. 1W.

Upon receiving Ms. Barney's response, which expressed sympathy, denied the request

for extended leave and warned of termination if absent without leave, Ms. Dillon wrote the

following response on December 23, 2002:

> Patti, I honestly cannot recall that I would be terminated.  Based on
> your response, I am supposing the merit rules does [sic] not deal with
> sick leave for grandparents, my grandmother actually raised me, I
> feel the need to find her a safe home.
>
> When I came I had no idea the condition my grandmother was in.  I
> see the need to find a home for my grandmother and I am trying to
> place her in a home, and I am plea[d]ing to your compassion to give
> me the chance to place my grandmother in a home.  I am going
> around checking out places before the holidays, that was my goal to
> get her in the home before the holidays, I am not successful as of yet,
> I have some places [I'm] looking at today.
>
> If you cannot grant me the request for sick leave to take care of my
> grandmother, it is possible to check with Trudye Johnson, if the merit
> rules covers [sic] me for this sick leave extension of time to take care
> of grandmother.

Pl.'s Ex. 8 (CD00158); Def.'s Ex. 1U.

A need to care for a parent with a serious health condition includes "situations where the

employee may be needed to fill in for others who are caring for the family member, or to make

arrangements for changes in care, such as transfer to a nursing home."  Jury Inst. No. 22.  A

26

transfer to a nursing home is illustrative of making arrangements for changes in care, demonstrated by the words "such as."  The "home" Ms. Dillon seeks to find for her grandmother is **not defined** in these e-mails.  A reasonable jury could infer the home is a nursing home, a senior assisted living facility or just better living accommodations.  A reasonable jury could find that, regardless of the type of "home," the effort by Ms. Dillon qualifies as making arrangements for changes in care.

Finally, during the trial Dr. Nesbeth was questioned extensively about the *Certification* which MNCPPC had before it terminated Ms. Dillon on January 17, 2003.  On the *Certification*, Dr. Nesbeth responded in the affirmative to the question, "If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation?"  Based on the evidence presented at trial, a reasonable jury could find Ms. Dillon was needed to care for her grandmother in accordance with the first sentence of Jury Instruction No. 22.  Defendant fails to demonstrate its entitlement to judgment as a matter of law on this issue.

5.      *Termination: Insubordination or Unlawful Interference with FMLA Rights?*

Defendant argues Ms. Dillon was terminated because of insubordination and not because she sought FMLA leave.  Since Ms. Dillon's FMLA rights were not interfered with unlawfully, Defendant is entitled to judgment as a matter of law.  Defendant relies on Ms. Barney's January 3, 2003's Notice of Intent letter.  In that letter Ms. Barney explains the reasons for dismissing Ms. Dillon:

> Although I understand the circumstances you were under, I had offered that you take the three weeks off at a different time.  The Department denied requests made by other employees for extended annual leave during the same time frame for the same reasons.  Leave

is granted at the discretion of the Commission based upon the needs for your service in the work program.  As the Department Director, I often must make difficult decisions.  I try to be fair in reaching those decisions and do so after much thought and consideration of the facts presented.  In this case, you were notified far in advance of the time period requested that the three weeks of annual leave would not be approved.  You told me specifically that you intended to take that time off even if it wasn't approved, a clear demonstration of your disregard for Commission policy and my position as your department head.  You have provided me with no credible evidence whatsoever as to how your absence was caused by anything other than a family vacation, and were provided with a fair and explicit warning about the likely consequence of your insubordinate action.

Pl.'s Ex. 9 ("CD00079"); Def.'s Ex. 6, at 4.

Defendant asserts Plaintiff has the burden of demonstrating MNCPPC unlawfully interfered with her FMLA rights.  Plaintiff has failed to do so since her termination was for other reasons (AWOL and insubordination).  According to Defendant, the Notice of Intent and Dismissal letters clearly demonstrate Ms. Dillon's termination was for non-FMLA reasons.  "Although a meritorious FMLA entitlement could change the outcome on the absen[ce]-without-leave component, the insubordination basis is unaffected, particularly in light of the uncontested facts that show Ms. Dillon never changed her airline tickets even though she knew there were no flights to standby on between December 25-30, 2002, and further knew she could not get back to work when required and traveled to Jamaica anyway."  Def.'s Combined Mem., at 32.

Defendant argues its dismissal of Ms. Dillon was meritorious.  Even if not, analogous to Title VII law, MNCPPC has articulated legitimate, non-discriminatory reasons for the termination and Plaintiff has not rebutted by showing pretext.  "Since Ms. Dillon was subject to dismissal regardless of the outcome of the FMLA issue, none of any alleged losses could be said to be caused 'by reason of the violation.'" *Id.* at 34.  Defendant asks for judgment as a matter of

law on this issue.

In her Opposition Plaintiff argues the issue of whether her termination was for non-FMLA reasons or for a FMLA reason was a factual finding which the jury resolved in Plaintiff's favor.  Plaintiff notes Judge Chasanow recognized the non-FMLA reasons and the FMLA reason are intertwined.

> Although it is true that [the Notice of Intent and Final Dismissal Letters] refer to reasons other than her AWOL status as a basis for terminating Plaintiff, all of these reasons are inextricably intertwined with her request for FMLA leave, the denial of which resulted in Plaintiff's termination.  Indeed, after Ms. Barney chronicled the events surrounding Plaintiff's initial request for 3-weeks leave, and her subsequent request for an extension, she explicitly stated that if she found Plaintiff's response to the Notice Letter satisfactory, including her explanation as to how the latter request may qualify under the FMLA, Plaintiff would not be dismissed.

*Dillon*, 382 F. Supp. 2d. at 791.

A reasonable jury, after listening to the testimony and reviewing documentary evidence, could find MNCPPC terminated Ms. Dillon because she extended her leave, beyond the approved period, to care for her grandmother.

In its Reply Defendant reiterates that the Notice of Intent and Dismissal letters clearly identify the bases for termination as non-FMLA reasons.  At trial Ms. Barney testified that she had to evaluate two separate issues — insubordination and FMLA qualification.  Ms. Barney testified that Ms. Dillon would avoid dismissal only if she proved her FMLA qualification and proved she changed her original airline ticket.  Ms. Dillon failed to prove these matters.  The evidence clearly shows Ms. Dillon was terminated for non-FMLA reasons.  "Notwithstanding Plaintiff's contrary protestations, the insubordination issue was proper[l]y submitted to the jury and the jury's f[i]nding was in error as a matter of law."  Def.'s Reply, at 11.  Defendant seeks

judgment as a matter of law.

At trial Ms. Barney explained how she approached resolving two distinct issues —

insubordination and FMLA qualification.

> Q:  In order to justify not terminating her employment, did you have to get past both issues?
>
> A:  I had to get past both issues, yes.
>
>   So if I could get past the insubordination issue – – again, being consistent throughout the department, if another person says they're going to take leave and takes it, I have to handle it the exact same way.  If I could get past that by seeing that she had changed her tickets, I could move that to the side, and then I could see if I could still approve leave, family medical leave if she qualified, or maybe even annual leave if I could see that there was no one else to help her and I could somehow justify that, again having to live with this for the rest of the department.
>
>   So that was – – that was where I was coming from, having to deal with both of those issues, and that's what [the Notice of Intent letter] was intended to portray to Cynthia.

Tr. at 44:25 - 45:15 (March 22, 2006).

During the trial evidence was presented about Ms. Dillon's November 2002 meeting with

Ms. Barney.  During this meeting Ms. Dillon expressed an intention to take three weeks of leave

even if it is not approved.  Ms. Barney warned Ms. Dillon of the consequences.  This meeting is

memorialized in Ms. Barney's November 7, 2002 Record of Meeting.

> Cynthia requested to meet with me and to discuss her leave request, which had been turned down.  Cynthia explained that she had wanted to go to Jamaica in June for a family reunion and to go to her uncle's funeral.  The leave had been denied due to work program.  She had felt badly and her family had been disappointed.  She then submitted another leave request in August for 3 weeks from 12/12 to [01/02/]03.  This leave request had also been turned down.  Cynthia explained how important it was to her to go at this time.  She hadn't been back for 5 years and that she needed to go when here [sic]

children were out of school which meant summer or Christmas vacation. Her grandmother is very ill, and she wants to visit her before it is too late. She is very close to her grandmother. She also indicated that her husband had already bought the tickets.

I explained that I understood her situation; however, she should not have bought the tickets before her leave was approved. She had been informed in August that because of the personnel/payroll system implementation and year-end processing that 3 weeks off in December and early January was not possible.

Cynthia explained that she was going to go even if her leave was not approve[d]. I indicated that she would lose her job if she went without approved leave. I indicated that I would talk with Al Warfield to see if there was some way that another person, possibly in payables, might be able to cover for her during that time period. I also indicated that next summer may be possible because we are trying to implement electron time entry or another extended period after the implementation.

Def.'s Ex. 3.

Ms. Barney testified that if Ms. Dillon had provided proof that she changed her airline tickets, she (Ms. Barney) would have gotten past the insubordination issue. *See* Tr. at 46:21 - 24 (March 22, 2006). However, even if Ms. Dillon was entitled to FMLA leave, Ms. Barney would have nonetheless terminated Ms. Dillon because of the insubordination issue. *See* Tr. at 54:3 - 6 (March 22, 2006). Ms. Barney further testified that Ms. Dillon appealed her termination to the appropriate board which found the termination appropriate because of insubordination and AWOL. *See* Tr. at 56:14 - 17.

The above excerpts and citations to Ms. Barney's testimony support Defendant's contention that the dismissal was strictly for non-FMLA reasons. On cross-examination the jury likely gained greater insight about Ms. Barney's views.

Q: Ms. Barney, it's true, is it not, that she was – – Ms. Dillon would not have been in violation of her approved leave until December

23rd?

A:  I'm having difficulty with the question because she knew when she went on the trip – – she didn't know about her grandmother when she went on the trip, yet she took the trip knowing that there was uncertainty whether she could be back in time.  So that, to me, seems like a violation of policy.  If I tell somebody that they have to be back to work back on Monday and they take an action which indicates they might not be, to me, that's a violation.  That's me, my viewpoint.

Q:  Well, it wouldn't be insubordination unless she violated some specific instruction, would it?

A:  I think it was insubordination.  I met with her.  She indicated she was taking the leave, regardless if it was approved, and then she took the trip knowing that there was no guarantee that she would be able to conform with that.  So that's my opinion.

Q:  But doesn't every employee have the right to take that risk and hope that they'll be able to come back?  Or even if they're a day late, well, at least I'm only a day late?

A:  I don't believe so.  I think employees try to – – are working to comply with the leave that's approved.  If they know in advance that there's an issue, then I think that's a problem.  If they don't know there's any problem, well, then possibly something happens, but if they – – if they know in advance that they cannot meet that commitment, I do think that's a violation.

Q:  Why is it a violation?  If she takes the risk that she's going to have trouble getting back on the 23rd, that's her problem at that point, is it not?

A:  I believe that's my problem.

Q:  Your problem comes in when she's not there on the 23rd and she's, at that point, AWOL.

A:  I believe they are very related.  It's my problem if an employee makes an indication to me that they will be at work on time to process a critical function in the department and they knowingly leave, knowing that there's a question as to whether they can comply with that directive.  That is my answer.  I'm sorry.  That's how I view it.

> Q:   I understand that's how you view it because I think you make
> that pretty clear in the dismissal letter, Ms. Barney, but it is true that
> she put in the request for the additional leave on the 19th, before she
> was in violation of her approved leave through the 20th, and that had
> that Family Medical Leave Act application been approved, she would
> not have been in violation?
>
> A:   I disagree with that.  I believe that when she left knowing that
> she could not comply with the leave request, that she had violated my
> direction for the time period of leave.
>
>      I don't know how else to answer that question.  I'm sorry.  That
> is my answer.

Tr. at 77:25 - 80:2 (March 22, 2006).

In the Dismissal letter, the jury may have obtained some additional insight regarding how

Ms. Barney viewed Ms. Dillon's situation.

> As you know, I have repeatedly asked you for <u>any</u> documentary
> information to support your contention that your Grandmother's
> situation somehow required you to extend your stay in Jamaica;
> contrary to your previous statements which led me to believe that you
> had <u>refused</u> to change your trip schedule to conform with the period
> of approved leave.   During our meeting on the 10th, you
> acknowledged that you did, in fact, return according to your original
> ticket and schedule.  In this light, I cannot find any credible reason to
> believe that you ever intended to comply with my very clear direction
> that you were responsible to return to the office from leave on
> December 23, 2002.

Pl.'s Ex. 12 (#CD00064); Def.'s Ex. 9, at 1.

From Ms. Barney's testimony and written statements, a jury could reasonably infer Ms.

Barney did not believe Ms. Dillon <u>ever</u> had the intention to return to work on December 23,

2002.  In fact, Ms. Barney believed Ms. Dillon was in violation when she departed on December

12, 2002 because Ms. Dillon did not have a return ticket guaranteeing an arrival before

December 23, 2002.  According to Ms. Barney, despite the fact that Ms. Dillon requested an

extension on December 19, 2002, a day before her approved leave ended on December 20, 2002,

Ms. Dillon nonetheless violated Ms. Barney's direction because Ms. Dillon did not have a

guaranteed flight returning her before December 23, 2002.  In short, a jury could reasonably

infer Ms. Barney disbelieved Ms. Dillon's assertion of a need for leave to take care of her

grandmother.  "You have provided me with ***no credible evidence*** whatsoever as to how your

absence was caused by anything ***other than a family vacation***, and were provided with a fair and

explicit warning about the likely consequence of your insubordinate action."  Pl.'s Ex. 9

("CD00079) (emphasis added); Def.'s Ex. 6, at 4 (emphasis added).

On cross-examination Ms. Barney would not acknowledge that Ms. Dillon would not be

in violation of her approved leave until she failed to report for work on December 23, 2002.

"[S]he didn't know about her grandmother when she went on the trip, yet she took the trip

knowing that there was uncertainty whether she could be back in time.  So that, to me, seems like

a violation of policy."  Tr. at 78:4 - 7 (March 22, 2006).  This demonstrates how "inextricably

intertwined" the non-FMLA reasons and the FMLA reason are.  A reasonable jury could infer

from Ms. Barney's January 3, 2003 Notice of Intent letter, if Ms. Dillon provides a satisfactory

response about her entitlement to FMLA, Ms. Dillon would not be dismissed.  *See* Pl.'s Ex. 9;

Def.'s Ex. 6.

In Jury Instruction No. 10, the jurors were told, "You are the sole judges of whether

testimony should be believed.  In making this decision, you may apply your own common sense

and everyday experiences."  Reasonable jurors, applying their own common sense and everyday

experiences, may have rejected Ms. Barney's testimony that Ms. Dillon was insubordinate as of

December 12, 2002, because Ms. Dillon did not possess a return ticket before December 23,

2002.  "I think the jury can construe that she was in a leave status until Monday morning, the

23rd.  How she came back really wasn't for the Maryland National Capital Park and Planning

Commission to decide . . . so long as she walked into work on Monday morning and could do the

payroll, she would be in compliance."  Tr. at 76:19 - 22, 25 - 77:2 (March 22, 2006).  The jury

had the discretion to "reject all of the testimony of a particular witness, none of the testimony of

a particular witness, or part of the testimony of a particular witness."  Jury Inst. No. 10.  A

reasonable jury could find, after listening to the testimony and reviewing documentary evidence,

the insubordination issue and FMLA leave request are "inextricably intertwined" because Ms.

Dillon would not have been insubordinate had Ms. Barney granted Ms. Dillon's request for

extension of leave to care for her grandmother.  Defendant fails to demonstrate its entitlement to

judgment as a matter of law on this issue.

      6.    *Proof of Lost Wages*

     Defendant claims the lost wage award of $76,914 is not supported by the evidence.

Defendant notes Plaintiff failed to present a methodology or evidentiary support to enable the

jury to determine damages.  Plaintiff's counsel suggested $75,000 award[8] for lost damages

without providing a methodology for calculating this amount.  Defendant contends Plaintiff

should not be awarded more than $62,088.72.  This figure is derived by calculating the total

wages ($169,296.64) Ms. Dillon would have received from MNCPPC from January 17, 2003 to

March 23, 2006, including 3.5 % annual merit increases, minus the amount ($97,415.89) Ms.

Dillon earned post-termination as reflected on W-2s and the annual leave payout ($9,792.03).

Defendant seeks judgment as a matter of law or, in the alternative, an order amending or altering

---

[8] Actually, Plaintiff's counsel argued for $70,000 to $75,000 as any appropriate award.  *See* Tr. 161:3 - 8
(March 22, 2002).

the judgment to $62,088.72.

In her Opposition Plaintiff notes she was earning $50,286.81 when she was terminated on January 17, 2003.  A reasonable jury could have found, with a 3.0% cost of living adjustment and a 3.5% merit based increase annually, Plaintiff would have earned $183,014.73 from January 17, 2003 to March 23, 2006.  Even if $97,415.89 as earned post-termination income and $9,792.03 as annual leave payout are deducted, Plaintiff would be entitled to receive $75,806.81, within the range of the jury's verdict and well above the $62,088.72 maximum award suggested by MNCPPC.  Pl.'s Opp'n, at 24-25.  Moreover, while MNCPPC subtracts all of Plaintiff's post-termination income from the total amount owed to Plaintiff, a reasonable jury could have found, if Plaintiff had not been terminated, she would have worked for MNCPPC as well as a part-time job.  "[T]herefore, the jury could have reasonably not subtracted at least one of the other part-time jobs from the back pay total.  This would have put plaintiff over the $76,914 total that the jury came to."  *Id.* at 25.  Plaintiff asks that the jury's verdict as to damages not be altered or amended.

In its Reply Defendant notes, for the first time during post-trial motions, Plaintiff has identified a methodology for calculating a back pay award.  Defendant claims Plaintiff improperly relies upon information not presented at trial, specifically an annual cost of living adjustment of 3%, to support the jury's verdict.  Defendant also rejects Plaintiff's assertions, articulated for the first time post-trial, (1) that a reasonable jury need not deduct all of Plaintiff's post-termination income from an award and (2) that a reasonable jury could assume Ms. Dillon would have worked at least one part-time job had she not been terminated by MNCPPC, and therefore the income for such a part-time job need not be deducted from the back pay award.

"Ms. Dillon never advanced either of these arguments during trial so she certainly could not have provided any proof that she could have worked both jobs."  Def.'s Reply, at 16-17 (footnote omitted).

In Jury Instruction No. 38, the jurors were told:

> The burden is on the plaintiff to prove by preponderance of the evidence each item of damage claimed to be caused by the defendant. In considering the items of damage, you must keep in mind that your award must adequately and fairly compensate the plaintiff, but an award should not be based on guesswork.

The Court rejects Plaintiff's assertion that the jury's verdict of $76,914 could have possibly included income earned from a part-time job.  No evidence was introduced supporting such an assertion and an award including such compensation would have been based on guesswork. Further, no evidence was introduced regarding 3.0% annual cost of living increase.[9]  One reference was made about annual cost of living increases but no definite percentage was ever introduced.  Plaintiff did not introduce this evidence.  It was elicited by Defendant in its case in chief.

> Q:   With Ms. Dillon, was she a grade G in the Commission's classification system?
>
> A:   Yes, she was.

---

[9] Plaintiff argues evidence was submitted to the jury regarding a cost of living increase.  "[P]laintiff's exhibit 2 shows that plaintiff's salary rose by 3% from $47,165.43 per year to $48,586.29 per annum between October 2001 and November 2002 – a difference a reasonable jury could have found that can only be accounted for by a cost of living increase since the merit based 3.5% increases are reflected elsewhere on those pages."  Pl.'s Opp'n, at 24 n.9.  Even though this may be true, no evidence was presented that the cost of living increase of 3.0% was given annually.  Plaintiff's counsel did not specifically include a *3.0% cost of living increase* in his closing argument to the jury.  "If you give, as you're entitled to do, 3.5 percent, as we showed she was getting about the time that she was still working for the employer during the two evaluations, she was getting 3.5 percent increases each year, you tack that on to the last paycheck that she had for that, and you will see that there's approximately 70 to $75,000 difference in pay, which we maintain she's entitled to as the cost of getting fired when she was entitled to family medical leave."  Tr. at 160:25 - 161:8 (March 22, 2006).

Q:   Is there a top of the range for that position?

A:   Yes, there are.  In each of the grade levels, there's a minimum and a maximum salary that you can earn in a particular grade, and there is – – what we call top of grade is when you've hit that maximum, you no longer would get the three and a half percent increase.  If you received a two on your evaluation, you would get a three and a half percent increase.  It's called a merit increase.  But if you reach that top of grade, you do not receive that.

Q:   So would there come a point in time that other than *cost of living increases*, Ms. Dillon's salary at the Commission would have been capped?

A:   If she reached that top of grade, yes, that's true.

Q:   To your knowledge, had she been in her grade for quite awhile by the time of 2002?

A:   I believe she had been in her grade a long time, yes.

Tr. at 86:9 - 87:2 (March 22, 2006) (emphasis added).

Plaintiff's counsel makes a passing reference to cost of living increases in closing argument.  *See* Tr. at 160:24 - 25.  He does not indicate however what that percentages were from January 17, 2003 to March 23, 2006.  Plaintiff had the burden of proving she is entitled to an annual cost of living increase and also the burden of proving what that rate would have been.

Besides Ms. Barney's testimony concerning the 3.5% merit increase, Ms. Dillon provided testimony on this topic.

Q:   Ms. Dillon . . . can you identify Plaintiff's Exhibit 2 and what that records?

A:   Yes.  This is the – – we call this the PA2, which is the personnel action, where at your anniversary, this gives you – – tells you what your next salary is going to be.

Q:   Okay.  And is this associated with the quality of the evaluation you got at the end of the year?

38

A:  Yes.

Q:   In other words, I notice you got a 3.5 percent increase on this exhibit, Plaintiff's Exhibit Number 2.  Could it have varied?  It could have been less?

A:  I think this is the normal – – because I get a two, then you get it. If you don't get a two, then you don't get it.

Q:  I see.  So if you had not achieved the two on your overall rating, you wouldn't have gotten the 3.5?

A:  No.

Q:  Okay.  So it's consistent with the evaluation you've received?

A:  Yes, sir.

Q:  And is the next document there also for the very next year?

A:  Yes, sir.

Q:   And it shows again a 3.5, and was that consistent with the two overall rating you achieved for that year?

A:  Yes, sir.

Tr. at 73:23 - 74:22 (March 21, 2006).  Despite Ms. Barney's testimony, *see* Tr. at 86:9 - 87:2 (March 22, 2006), Defendant has not presented any evidence affirmatively establishing Ms. Dillon was not entitled to receive a 3.5% merit increase annually between January 17, 2003 and March 23, 2006 because Ms. Dillon had reached the top of her grade.  The Court thus finds Ms. Dillon would be entitled to a 3.5% increase annually on her anniversary date of September 19th.

It is undisputed, that post-termination, in 2003 Ms. Dillon earned $4,824.00 from Benevolent Home Health Care, Inc., $9,792.03 (as annual leave payout) from MNCPPC and $3,140.38 from Heartland Employment Services ("Heartland"), for a total of $17,756.41.  *See* Pl.'s Ex. 14, at 2.  In 2004 Ms. Dillon earned $33,691.36 from the American Institute of

39

Certified Public Accountants ("AICPA"), $1,553.00 from ATC Healthcare Services, Inc., and $8,688.15 from Heartland, for a total of $43,932.51.  *See id.* at 3.  In 2005 Ms. Dillon earned $44,079.84 (true gross through December 15, 2005) and $2,044.07 (presumed true gross for last paycheck for the year)[10] from AICPA for a total of $46,123.91.  *See id.* at 4.  The total wages earned from 2003 through 2005 are $107,812.83.

Plaintiff apparently did not disclose to Defendant her methodology for calculating lost wages before trial.  A reasonable jury could calculate Plaintiff's lost wages based on her gross salary from MNCPPC, including a 3.5% merit increase annually, for each year thereafter and deducting gross income earned during that period.  *See* Tr. at 115:25 - 116:5 (March 21, 2006).

Defendant claims Ms. Dillon would have earned $169,296.64 as the total amount of wages, including 3.5% annual merit increase, from January 17, 2003 to March 23, 2006.  *See* Def.'s Combined Mem., at 35.  Plaintiff claims the earned income would have totaled $183,014.73 which includes both a 3.0% annual cost of living adjustment and a 3.5% annual merit increase.  *See* Pl.'s Opp'n, at 24.  Having found it would have been unreasonable for the jury to assume Plaintiff received a 3.0% cost of living adjustment annually, the Court does not accept Plaintiff's figure.  While Defendant's figure does not include the cost of living adjustment, Defendant does not demonstrate how it arrives at its figure.  Because Plaintiff's figure includes 3.0% cost of living adjustment and Defendant's figure cannot be verified, the Court will defer amending or altering the judgment until the parties file supplemental calculations.  *See infra.*

---

[10] The Court makes this assumption since Plaintiff did not introduce as evidence her 2005 W-2.

7.      *Mitigation of Damages*

Defendant contends Plaintiff's award for lost wages should have been reduced because Plaintiff failed to mitigate her damages.  Under Fourth Circuit law, Plaintiff must mitigate damages by diligently seeking new employment substantially similar to the type held before being discharge, citing *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985).  The information Ms. Dillon provided during trial about her attempts to secure employment was vague.  "She said that she applied to temporary employment agencies and posted her resume on an internet job site (Monster.com).  The [MNCPPC] submits that the conclusion that Ms. Dillon exercised reasonable diligence is belied by a failure, with her administrative background, to even secure even [sic] a single administrative assignment from a temporary agency in a nine-month period.  Instead, the evidence showed that she turned her attention to an educational program directed toward an alternate career."  Def.'s Combined Mem., at 37.  Defendant claims the jury's finding on mitigation was against the weight of evidence and therefore a new trial is mandated.

In her Opposition Plaintiff contends, after she has established entitlement to back pay, then Defendant has the burden of demonstrating its affirmative defense that Plaintiff failed to mitigate damages.  Plaintiff notes Defendant did not introduce any evidence about the availability  of substantially equivalent positions from which Plaintiff was terminated.  This alone is fatal to Defendant's argument.  Second, Defendant does not demonstrate that a reasonable jury could find Plaintiff failed to mitigate her damages upon termination.  "Plaintiff testified that she made numerous applications for employment after being terminated by defendant, but was simply unable to obtain employment . . . [S]he repeatedly sought

employment, including posting her resume on the web, looking through want ads and filling in applications.  Indeed eventually she took nursing classes because she could not find work in her chosen field – and then found employment, albeit lower paying, in this new field."  Pl.'s Opp'n, at 26-27.  Plaintiff argues a reasonable jury could find Defendant failed to meets its burden of showing Plaintiff failed to mitigate damages.

In its Reply Defendant notes, once a wrongfully discharged employee produces evidence to support her claim for back pay based on an inability to find comparable work, then the employer has the burden of demonstrating the employee's efforts to mitigate her damages were not reasonable.  Defendant argues Plaintiff never satisfied her burden; thus, the burden never shifted to Defendant.  Plaintiff's evidence is lacking because she never proved the extent of her search by citing the frequency of such activity.  Since Plaintiff failed to prove she was actively seeking employment, the jury's conclusion on mitigation was against the weight of evidence and a new trial is mandated.

In Jury Instruction No. 38 the jury was told Plaintiff has the burden to prove each item of damage claimed to be caused by Defendant.  The jury was instructed on mitigation as follows:

> You are also instructed that the plaintiff has a duty under the law to "mitigate" her damages — that is, to exercise reasonable diligence under the circumstances to minimize her damages.  Therefore, if you find by a preponderance of the evidence that the plaintiff failed to seek out or take advantage of an opportunity that was reasonably available to her, you must provide an amount that should be subtracted from the award.
>
> Remember, throughout your deliberations, you must not engage in any speculation, guess, or conjecture and you must not award damages under this Instruction by way of punishment or through sympathy.

Jury Inst. No. 39.[11]

"[T]he duty to mitigate damages requires that the claimant be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged." *Brady*, 753 F.2d at 1273.  The employer bears the burden of demonstrating that the employee failed to mitigate damages.  *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995).  In demonstrating this failure to mitigate damages, an employer is not required to prove the availability of substantially equivalent jobs which the employee could have secured. *Quint v. A. E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999).

On direct examination Ms. Dillon testified, after being terminated by the MNCPPC, she made efforts to secure employment.  She signed up online, applied with temporary agencies and sought opportunities by word of mouth.  Unable to find a job, she became frustrated and registered for a nursing assistant course which started in March 2003 and ended in August 2003. *See* Tr. at 109:25 - 110:9 (March 21, 2006).  Ms. Dillon subsequently secured employment as a nursing assistant and worked for two health care employers in 2003.  *See* Tr. at 110:10 - 14, 111:8 - 23 (March 21, 2006).

On cross-examination, Defendant's counsel inquired about Ms. Dillon's efforts to secure employment.

> Q:   Ms. Dillon, you indicated that you made efforts to secure employment after employment was terminated in January.
>
> A:  Yes, sir.
>
> Q:  When did you first become employed after January?

---

[11] Source:   Sand, et al., *Modern Federal Jury Instructions*, Instruction 88-150.

A:  I first became employed with – – I honestly don't remember the exact date, but I think in – – I started working with Benevolent first, and then Manor Care hired me in September, somewhere about there.

Q:    September.   So from January to September, you were unemployed in 2003?

A:  Yes, sir.

Q:  And you said that you had gone online, I think, and tried to sign up with temporary agencies?

A:  No.  I – – you know, they have where you can post your resume. I post my resume, and I applied with temporary agencies.

Q:  Okay.  I guess I'm hearing a distinction.  You – – you didn't – – you posted your resume with temporary agencies but you didn't – – did you actually pursue opportunities?

A:  Yes, sir.  Yes, sir.  Most of the temporary agenc[ies] that I called up, they weren't using anyone at the time.   And also I posted my resume on Monster.com.   I applied on several – – for several jobs over the internet and also by word of mouth.

Q:   What type of jobs did you apply for?

A:  I was looking for administrative, mainly administrative, the field that I was in.   Administrative.

Q:   But so is it your testimony that with you skill set, you weren't able to get a temporary job for a nine-month period?

A:   Yes, sir.  And I was really shocked at that time.

                    *   *   *

Q:   When – – at the time when you were pursuing unemployment and pursuing your Merit Board appeal, were you looking for work at that point, or did you wait?

A:  No, sir.  I had to – – I diligently search for work.  I have always worked since I came to this country.  This period of time was my first time not working for such a long time.

44

Tr. at 128:15 - 129:21, 130:8 - 14 (March 21, 2006).

Based on Ms. Dillon's testimony, a reasonable jury could find Ms. Dillon was diligent in seeking employment. After two months of fruitless searching for a comparable administrative employment, Ms. Dillon decided to become trained as a nursing assistant in order to secure employment. Although neither counsel asked why Ms. Dillon sought training as a nursing assistant, a reasonable jury could infer, based on job announcements or her interactions with temporary agencies, Ms. Dillon may have learned her best chance of securing employment (with the least amount of time and money for training) was as a nursing assistant. A reasonable jury could also find, as a wife and mother of five children, Ms. Dillon had sufficient motivation to find employment and would have diligently sought such employment. A reasonable jury could find Defendant did not prove that Ms. Dillon failed to mitigate her damages.

B.      *Motion for New Trial*

Defendant lists 10 reasons why a new trial should be granted because of unfair prejudice. The Court addresses each reason below.

1.      *Admission of Post-January 17, 2003 Information*

At trial the Court permitted the admission of  information that was not relayed to the MNCPPC before Ms. Dillon's termination on January 17, 2003. That evidence "consisted of testimony that Ms. Dillon's mother was 16 when she was born, financial support from her grandmother, Ms. Dillon being kicked out of the house by her mother when she became pregnant and details regarding living arrangements and time frames that were never shared with the [MNCPPC] in spite of repeated entreaties and good faith efforts recognized by this Court in granting partial summary judgment to Defendant." Def.'s Combined Mem., at 38. Defendant

claims Jury Instruction No. 34, which directed that jurors not to consider post-January 17, 2003 information, was ineffective as a limiting instruction.  Defendant argues admission of that information was unfairly prejudicial.

In her Opposition Plaintiff notes the Court resolved this issue when the Court granted in part and denied in part Defendant's Motion *in Limine*.  *See* Document No. 45.  Plaintiff relies on the Court's reasoning.  In its Reply Defendant contends Plaintiff relied on the post-January 17, 2003 information to support the jury's verdict, thus demonstrating the unfair prejudice to Defendant.

In this Opinion *supra*, the Court has identified how a reasonable jury could find Ms. Dillon's grandmother qualified as a parent under the FMLA and that her grandmother suffered a "serious health condition" by adhering to the Court's instruction and not considering any post-January 17, 2003 information.  For the reasons outlined in the March 3, 2006 Memorandum Opinion (Document No. 44, at 1 -7), the Court finds Defendant was not unduly prejudiced and denies the request for a new trial on this ground.

> 2.      *Admission of Dr. Nesbeth's Testimony*

Defendant claims it was unfairly prejudiced by the testimony of Dr. Nesbeth.  Her testimony was not limited to authentication of the Medical Certification form.  Despite Defendant's objections, she provided opinion testimony.  Defendant notes Plaintiff's failure, during discovery, to identify Dr. Nesbeth as a hybrid expert and to produce responsive documents.  "The expert/opinion component of her testimony was never disclosed even in the Pre-trial Order and no discovery was provided as would fairly meet the substance of the requests directed specifically to expert opinions and documents. . . ."  Def.'s Combined Mem., at 39.

Defendant thus did not have the opportunity to identify and retain a responsive expert.

In her Opposition Plaintiff notes the Court ruled on this matter before a jury was empaneled, holding that Dr. Nesbeth was a fact witness since she was the grandmother's treating physician and thus not especially retained for litigation.  Plaintiff claims she provided notice to Defendant in response to discovery and in the pre-trial statement.  Despite this knowledge Defendant never attempted to depose Dr. Nesbeth.  According to Plaintiff, Defendant was aware of Dr. Nesbeth's opinion when Ms. Dillon submitted the portion of the FMLA certification completed by Dr. Nesbeth.

In its Reply Defendant asserts Plaintiff identified Dr. Nesbeth as the provider of the FMLA medical certification form and further disclosed Dr. Nesbeth could testify regarding the need to find an assisted living residence for the grandmother.  Defendant does not believe Dr. Nesbeth testified about the need for assisted living.  Defendant argues Plaintiff relied on Dr. Nesbeth's undisclosed opinion as well as embellishments and expansions outside of the FMLA medical certification form, to prove that the grandmother had a serious health condition and that Ms. Dillon was needed to care for the grandmother.  Defendant reiterates it was unfairly prejudiced and thus a new trial is mandated.

The Court has quoted Dr. Nesbeth's testimony extensively.  *See supra*.  Dr. Nesbeth was permitted to provide background information about a "TIA", an abbreviation clearly listed on the FMLA medical certification form, to explain the condition to the jurors.  Dr. Nesbeth has been the grandmother's treating physician since 1997.  On the form Dr. Nesbeth wrote that the grandmother was 81 years old.  On the form Dr. Nesbeth opined that the grandmother would be incapacitated for two to three weeks.  On the form Dr. Nesbeth answered in the affirmative that

the grandmother required assistance for basic medical or personal needs or safety or for

transportation.  All of this information was available to the MNCPPC *before* January 17, 2003.

Dr. Nesbeth was examined, both on direct and cross, about the bases for her opinions.  The Court

finds Defendant was not unduly prejudiced and a new trial is not mandated on this issue.

     3.     *Exclusion of Merit Board Decision*

Defendant contends the Court improperly excluded from evidence Defendant's Exhibit

10, Merit Board Decision, which was offered to demonstrate Ms. Dillon was terminated for non-

FMLA reasons.  According to Defendant this exhibit should have been admitted, especially in

light of the jury's questions.  In her Opposition Plaintiff argues the Court's decision was proper

since the Merit Board Decision is irrelevant and, like EEOC decisions, are normally not

disclosed to a jury.  In its Reply Defendant responds, "Plaintiff did not meaningfully address the

prejudicial failure to admit the Merit Board Decision (Exhibit 10) and its relevance to

insubordination and the jury's questions."  Def.'s Reply, at 20.

Before returning the verdict, the jury had three questions.  The first two questions are

relevant to this issue.  The first question asked to define insubordination.  The Court proposed to

instruct the jury as follows: "A willful disregard of an employer's instructions, especially

behavior that gives the employer cause to terminate a worker's employment; an act of

disobedience to proper authority, especially a refusal to obey an order that a superior officer is

authorized to give."  Tr. at 2:12 - 17 (March 23, 2006).  The second question concerned a

specific exhibit, which the jury identified as [Bates] Number 1933-CD00068, which is Plaintiff's

Exhibit 12, page 5.[12]  This page lists "Examples of Possible Causes of Disciplinary Action."  The

---

     [12] Although Plaintiff's Exhibit 12 and Defendant's Exhibit 9 are virtually identical, Plaintiff's Exhibit 12 includes an extra page, Bates # CD00068, the subject of the jury's second question.

jury's question was whether Category 1933 —Failure or refusal to perform duties and responsibilities assigned that may include but is not limited to (1933.1) Neglect of duty; (1933.2) Failure to follow direction — is considered insubordination.  The Court proposed to instruct the jury as follows:  "You must make this determination based on the evidence you have and my instructions, including the instruction listed immediately above [answer to Jury Question No. 1]."  Tr. at 2:20 - 23 (March 23, 2006).

Defendant's counsel objected to Court's proposed answer to Jury Question No. 2.

> With regard to the response to the second question regarding Section 1933, including 1933.2 and 1933.1, the Commission's position is that those provisions constitute insubordination as a matter of law and could be so interpreted as a matter of law to be tantamount to insubordination or synonymous with insubordination, and for that reason, we believe the Court could instruct with an affirmative answer to that question as a matter of law.

Tr. at 3:8 - 16 (March 23, 2006).  After considering Defendant's objection, the Court instructed the jury as it had proposed.

This Court has discretion whether to admit or exclude the findings of an administrative body such as the Merit Systems Board.  *Cox v. Babcock & Wilcox Co.*, 471 F.2d 13, 15 (4th Cir. 1972).  The Court excluded the proposed Defendant's Exhibit 10 to prevent the jury from being unduly influenced by the Merit Systems Board's decision which, in turn, could invade the province of the jury.  Defendant is not entitled to a new trial on this issue.

4.      *Jury Instruction Regarding Unlawful Interference*

"The failure to instruct that part of Plaintiff's burden in demonstrating unlawful interference was to show that she would not have been terminated otherwise was unfairly prejudicial in a way demonstrated to be critical by the jury's questions submitted during

deliberation as it was Plaintiff's burden to show that she would have otherwise continued to be employed in order to prove any alleged damages were caused 'by reason of the violation.'" Def.'s Combined Mem., at 40.  In her Opposition Plaintiff claims there is no legal support for Defendant's proposition.  Normally, the burden is on Defendant to demonstrate Plaintiff would have been otherwise terminated once Plaintiff has shown her termination was for discriminatory reasons.  In its Reply Defendant reiterates that it is Plaintiff's burden to prove she would have otherwise continued to be employed in order to prevail on a claim of damages caused by Defendant's alleged violation.

The Court gave the following instruction to the jury:

> Since, under the FMLA, an employee's rights in the workplace are no greater than the rights to which the employee is entitled had she not taken FMLA leave, an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove that it would have made the same decision, in this case to terminate Ms. Dillon's employment, had the employee not exercise her FMLA rights.

Jury Inst. No. 32.

Defendant's counsel objected to this instruction.

> With regard to 32, the objection is that it is the – – although we believe that the instruction is largely appropriate that the defendant does not bear the burden or the employer does not bear the burden on that issue, it is bound up in the unlawful interference issue.

Tr. at 146:25 - 147:4 (March 22, 2006).  For the record, Plaintiff's counsel also objected to this instruction, but on the ground that intent is not an issue in the case.  *See id.* at 145:15 - 16 (March 22, 2006).

The Court derived Jury Instruction No. 32 from the Comment to Instruction 88-120 found in Sand, et al., *Modern Federal Jury Instructions*.  The Comment states:

50

> Since, under the FMLA, an employee's rights in the workplace are
> no greater than the rights to which the employee is entitled had he
> or she not taken FMLA leave, an employer who interferes with an
> employee's FMLA rights will not be liable if the employer can
> prove that it would have made the same decision, i.e., terminate or
> demote the employee, had the employee not exercised his or her
> FMLA rights.

Footnote omitted.

In accordance with Jury Instruction No. 16, Plaintiff had to demonstrate that she met all eight elements to maintain a FMLA claim based on the need to care for her grandmother with a serious health condition.  If she satisfied all eight elements, a reasonable jury could find, in answering Question No. 1 of the Verdict Form, that MNCPPC unlawfully interfered with Ms. Dillon's exercise of a protected right under the FMLA by denying her request for leave.  Even if a reasonable jury found an unlawful interference, a reasonable jury need not automatically find the MNCPPC terminated Ms. Dillon because she exercised a protected right.  A reasonable jury could have found, in answering Question No. 2 of the Verdict Form, that MNCPPC terminated Ms. Dillon because she was insubordinate.  The burden of proving that Ms. Dillon's FMLA rights were not unlawfully interfered with, because she would have been terminated despite the exercise of that protected right, properly rests with Defendant.  A new trial is not warranted on this issue.

5.    *Jury's Second Question Regarding Specific Merit Rule Sections*

"The jury's second question regarding whether the cited Merit Rule sections were insubordination should have been answered in the affirmative as they were as a matter of law based on the meaning of insubordination.  Based on submission of the question, this point obviously was of importance to the jury and the failure to answer affirmatively was unfairly

prejudicial to Defendant." Def.'s Combined Mem., at 40. The Court addressed this issue in

Section 3 (Exclusion of Merit Board Decision) *supra*. A new trial is not warranted on this issue.

      *6.*     *An Estoppel Instruction*

      Defendant claims the jury should have been instructed on estoppel "based on Ms.

Dillon's conduct, particularly the failure to seasonally provide information and fraudulent

information provided in the application." Def.'s Combined Mem., at 40. In her Opposition

Plaintiff asserts "[t]his premise is clearly in dispute and was itself a factual issue for the jury to

decide." Pl.'s Opp'n, at 29. Additionally, Defendant does not provide a legal basis for an

estoppel instruction. In its Reply Defendant contends an estoppel instruction should have been

given because MNCPPC, in good faith, relied to its detriment upon Ms. Dillon's representations.

Defendant notes at least one court in the Fourth Circuit has permitted the use of the equitable

estoppel doctrine in a FMLA case, citing *Blakenship v. Buchanan General Hosp.*, 999 F. Supp.

832, 837-39 (W.D. Va. 1998).

      Having reviewed *Blakenship*, this Court finds an estoppel instruction is not warranted. It

is noteworthy that all the cases cited in *Blakenship* concern the estoppel doctrine applying

against the employer, not the employee, for misrepresentation. Second, the facts of this case do

not involve an *undisputed* case of misrepresentation. Although Ms. Barney concluded Ms.

Dillon provided no credible evidence that her absence from work was caused by anything other

than a family vacation, a reasonable jury could conclude Ms. Dillon's absence from work was

due to the need to care for her grandmother who had a serious health condition. The jurors were

the sole judges of the facts and apparently found Plaintiff's case more believable. Regarding

Defendant's assertion that it made its decision to terminate Ms. Dillon based on the information

she provided before January 17, 2003 and thus MNCPPC relied on this information to its

detriment, the jury was instructed that any information not provided to MNCPPC before January

17, 2003 may not be considered on the issue of whether MNCPPC interfered with any FMLA

rights Ms. Dillon may have had.  *See* Jury Inst. No. 34.  No evidence has been presented that the

jury failed to follow the Court's instruction.  A new trial is not warranted on this issue.

   *7.*  *Verdict Form*

  Defendant argues that a new trial is warranted because the verdict form should have

required the jury to find each element of FMLA qualification.  In her Opposition Plaintiff notes

Defendant cites no authority for its proposition.  The jury was specifically instructed on the

elements Plaintiff needed to prove in order to support her FMLA claim per Jury Instruction No.

16.  Plaintiff contends listing the elements in the instructions and also on the verdict form would

have been confusing and superfluous.  In its Reply Defendant claims, "failing to submit separate

questions limited the jury's inquiry in a way that was confusing."  Def.'s Reply, at 21.

  Jury Instruction No. 16 is very explicit.  It begins, "[i]n order for a plaintiff to maintain a

FMLA claim based on the need to care for a spouse, parent, son or daughter with a serious health

condition, the plaintiff must prove all [eight] elements by a preponderance of the evidence. . . ."

The eight elements are listed in Jury Instruction No. 16 and definitions are provided in

subsequent instructions.  Although the verdict form did not require the jury to make a finding as

to each and every element as listed in Jury Instruction No. 16, the Court finds a reasonable jury,

after listening to Jury Instruction No. 16 and having a written copy of the instruction during

deliberations, would not have found that Plaintiff proved by a preponderance of the evidence that

MNCPPC had unlawfully interfered with the exercise of a protected right under FMLA by

denying her requested leave (Question No. 1) *if* the jury found that Plaintiff had not proven all eight elements of Jury Instruction No. 16.  A new trial is not warranted on this issue.

       8.     *Substitution of Caregiver Instruction*

      "The Jury should not have been instructed on the FMLA substitution of caregiver issue as there was no evidence sufficient to support it in light of the misleading application and [in] fact this basis was never provided to the employer prior to decision."  Def.'s Combined Mem., at 40-41.  Defendant alludes to Jury Instruction No. 22.  In her Opposition Plaintiff responds there was evidence introduced that Ms. Dillon was needed to care for her grandmother because the grandmother's normal caretaker was unavailable during the day.  Even if this information was not provided pre-termination, the Court allowed the introduction of this evidence which Plaintiff argues is relevant to show Ms. Dillon was in fact qualified for FMLA leave.  In its Reply Defendant states, "Counsel's testimony regarding an undisclosed caregiver not being able to care for Plaintiff's grandmother while at work is pure speculation not grounded in record evidence. Even if it had been it would be of dubious import given that the situation existed both before and after Plaintiff journeyed to Jamaica and had no relationship to the events at bar."  Def.'s Reply, at 22.

      Jury Instruction No. 22, which defines the phrase, "needed to care for," provides the following guidance relevant to Defendant's issue:  "The phrase also includes situations where the employee may be needed to fill in for others who are caring for the family member, *or* to make arrangements for changes in care, such as transfer to a nursing home."  Jury Inst. No. 22 (emphasis added).  Defendant focuses exclusive on the first clause (where the employee may be needed to fill in for others who are caring for the family member).  Based on the evidence

presented and this Court's instructions prohibiting the consideration of post-January 17, 2003

information, a reasonable jury could find Ms. Dillon was needed to care for her grandmother

because she was making arrangements for changes in care (the second clause).  In is undisputed

that in her e-mails to Ms. Barney prior to January 17, 2003, Ms. Dillon sought an extension

because her grandmother was ill and Ms. Dillon needed to find a better place for her

grandmother to live.  Defendant has presented no evidence showing the jury relied on the first

clause, vice the second clause in determining Ms. Dillon's FMLA entitlement.  A new trial is not

warranted on this issue.

  *9.*  *Mandatory Language*

  "The notice instruction should have been phrased consistently in mandatory language

throughout the instruction."  Def.'s Combined Mem., at 41.  Defendant alludes to Jury

Instruction No. 25.  In her Opposition Plaintiff recalls the Court ruled on this issue during the

charge conference.  The Court used the precise language in the regulation.  Defendant did not

address this issue in its Reply.

  The Court instructed the jury on the issue of notice, as follows:

> When the approximate timing of the need for leave is not foreseeable,
> an employee should give notice to the employer of the need for
> FMLA leave as soon as practicable under the facts and circumstances
> of the particular case.  It is expected that an employee will give notice
> to the employer within no more than one or two working days of
> learning of the need for leave, except in extraordinary circumstances
> where such notice is not feasible.
>
> The phrase "appropriate notice" as used in these instructions means
> that the plaintiff must have notified defendant of her need for leave
> as soon as practicable after she learned of the need to take leave.

  The first paragraph of Jury Instruction No. 25 is quoted directly from 29 C.F.R. §

825.303(a), the first two sentences.  The second paragraph of Jury Instruction No. 25 is quoted directly from Instruction 88-135 of Sand, et al., *Modern Federal Jury Instructions*.  Besides using the definition for notice as listed in the Code of Federal Regulations, the Court included the definition from *Modern Federal Jury Instructions* because Jury Instruction No. 16, which is based on Instruction 88-101 of *Modern Federal Jury Instructions*, uses the phrase "the plaintiff gave defendant *appropriate notice* of [his/her] need to be absent from work" as one of the elements Plaintiff must prove.  A new trial is not warranted on this issue.

> 10.     *Mixed Motive Instruction versus Motivating Factor Instruction*

"A 'motivating factor' instruction should not have been given.  If one was to be given, a mixed motive instruction also should have been provided."  Def.'s Combined Mem., at 41. Defendant alludes to Jury Instruction No. 30.  In her Opposition Plaintiff claims it is unclear what Defendant seeks since the court, in effect, gave a mixed motive instruction and verdict form.  "Normally, a mixed motive instruction implies that the court will instruct the [jury] to determine whether even if defendant discriminated against plaintiff defendant would have terminated plaintiff anyway and the jury will answer that question on the verdict form."  Pl.'s Opp'n, at 30-31.  Plaintiff contends that happened in this case.  In its Reply Defendant rejects Plaintiff's assertion about how the jury was instructed and contends the jury should have been instructed about a mixed motive.

Both parties agree that the jurors were properly instructed on the eight elements Ms. Dillon had to meet in order to maintain her FMLA claim, *see* Jury Instruction No. 16, though Defendant contends jurors should have been required to place their finding as to each element on the verdict form.  It is undisputed that the eighth element Ms. Dillon had to prove was that her

56

"absence from work was a *motivating factor* in defendant's decision to discharge plaintiff."  Jury

Inst. No. 16 (emphasis added).  Plaintiff proposed the "motivating factor" instruction.  The Court

ultimately determined this instruction is appropriate based on the term "motivating factor" being

used in Jury Instruction No. 16.  Jurors needed some guidance on the scope of the term

"motivating factor."  Jurors were instructed as follows: "The term 'motivating factor' means a

consideration that moved the defendant toward its decision, a factor that played a part in the

employment decision."  Jury Inst. No. 30.  Defendant's basis for a mixed motive instruction is

addressed by Jury Instruction No. 32 and Question No. 2 of the Verdict Form.  A new trial is not

warranted on this issue.

C.      *Motion to Alter or Amend Judgment*

As discussed *supra*, the Court finds a reasonable jury could not have found that Plaintiff

was entitled to receive an annual 3% cost of living adjustment.  Thus, the award of $76,914 as

lost damages is not supported by the evidence.  In determining the amount of lost wages Ms.

Dillon is entitled to receive, Plaintiff included an annual 3% cost of living adjustment in her

calculations.  Defendant identified a figure but failed to demonstrate the calculation used to

arrive at the sum.  Thus, the Court will defer altering or amending the judgment pending receipt

of Plaintiff's and Defendant's calculation of the maximum total lost wages Ms. Dillon was

entitled to receive based on 3.5% annual merit increase from January 17, 2003 to March 23,

2006.  Each party must demonstrate the computations used to arrive at their respective figures.

The parties must submit their figures and computations not later than *November 6, 2006*.

## CONCLUSION

For the foregoing reasons, Defendant's Renewed Motion for Judgment as a Matter of

Law and Motion for a New Trial will be denied.  Defendant's Motion to Alter or Amend

Judgment will be held in abeyance pending receipt of requested information.  An Order will be

entered separately.


October 27, 2006                                                                          /s/
_____                           _____
        Date                                                    WILLIAM CONNELLY
                                                     UNITED STATES MAGISTRATE JUDGE